IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATRICIA COUCH,                          )
                                         )
            Plaintiff,                   )   Case No. CV05-6324-HU
                                         )
        vs.                              )
                                         )
JO ANNE B. BARNHART,                     )
COMMISSIONER, SOCIAL SECURITY            )       OPINION AND
ADMINISTRATION,                          )         ORDER
                                         )
            Defendant.                   )
————————————————————————————————————————)

Kevin T. Lafky
Mindy Stannard
Lafky & Lafky
429 Court Street NE
Salem, Oregon 97301
      Attorneys for plaintiff

Karin J. Immergut
United States Attorney
District of Oregon
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600

1   - OPINION AND ORDER

Portland, Oregon 97204

Leisa A. Wolf
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
        Attorneys for defendant


HUBEL, Magistrate Judge:

    Claimant Patricia Couch brought this action under § 405(g) of the Social Security (the Act) to obtain judicial review of a final decision of the Commissioner of Social Security (Commissioner), denying her request for Disability Insurance benefits (DIB) under Title II of the Act and Supplemental Security Income (SSI) benefits under Title XVI of the Act.

### Procedural Background

    Ms. Couch filed an application for benefits on April 7, 1995, alleging disability since June 15, 1993, based on spondylitis, back and leg pain, urinary incontinence, depression, memory loss, and problems with concentration and balance. Tr. 14. Her applications were denied initially and upon reconsideration. On July 9, 1997, an administrative hearing was held before Administrative Law Judge (ALJ) William Stewart. On October 31, 1997, the ALJ issued a decision unfavorable to Ms. Couch.

    Ms. Couch appealed the Commissioner's decision to this court. On November 16, 1999, the parties stipulated to a remand

for further administrative proceedings. The remand stated that the ALJ was to 1) further consider the limitations imposed by Ms. Couch's impairments; 2) further consider the opinions of Dr. Solomon Wolf, a psychiatrist who evaluated Ms. Couch on December 2, 1995, including his opinion that Ms. Couch would be unable to deal with the public, unable to relate and interact with potential supervisors and co-workers, and unable to withstand the stresses and pressures associated with an eight-hour work day; 3) obtain further testimony from a vocational expert; 4) consider the State Agency opinion as to Ms. Couch's residual functional capacity; 5) further evaluate Ms. Couch's mental and physical functional capacity; 6) further consider Ms. Couch's activities of daily living in considering her subjective complaints; 7) consider the issue of whether Ms. Couch's alcohol abuse was in remission; 8) explain his finding that the evidence was equivocal on whether Ms. Couch's alcohol abuse was in remission; 9) obtain information about Ms. Couch's job titles and the reasons employment ended; and 10) address Ms. Couch's ability to engage in substantial gainful activity in terms of her ability to find and hold a job. Tr. 454-55. On November 24, 1999, this court entered an order remanding the case for further administrative proceedings. Tr. 456-57.

The Commissioner failed to comply with the order to remand until almost five years later. In an order dated September 15,

2004, the Appeals Council remanded Ms. Couch's claim to an ALJ
for further proceedings. In the interim, Ms. Couch had filed
additional applications, on August 21, 2001, and on May 20, 2004.
The Commissioner treated these claims as duplicative of the April
1995 claim, *see* tr. 440, and apparently no action was taken on
them by the Social Security Administration, because the ALJ noted
that they had been "associated with" the April 1995 claim. Id.

An administrative hearing was finally held before ALJ
Thomas Tielens on March 7, 2005. ALJ Tielens noted the five-year
delay in the Appeals Council after Ms. Couch's claim had been
remanded by the District Court:

> ALJ: And then in '99, Ms. Stannard [claimant's
>     attorney], the District Court sent this back?
> Atty: Yes.
>                    * * *
> ALJ: Here's the tough part: yet the Appeals Council
> remanded it in 2004.
> Atty: Um-hum.
> ALJ: Does that sound right?
> Atty: That sounds right.
> ALJ: Do you have any idea what was going on for those five
> years between '99 and 2004 with regard to this case? ...
> [N]ormally, if the District Court, in 1999, says I'm
> sending this case back, it usually gets here within three
> or four or five months. This has taken five years?
> Atty: I'm not sure.
> ALJ: Okay.
> Atty: I have no idea.
> ALJ: Okay. In the meantime, you filed another application.
> In-- what was it? 2004, I think?
> Atty: That's correct.
> ALJ: [To Ms. Couch] Why did you do that in 2004?
> Ms. Couch: Because I started having more physical problems
> and was wondering what was going on. I had made previous
> attempts, you know, to file on my bone disease. And then I
> was also involved in an accident on the Cherriot bus, which

4   - OPINION AND ORDER

```
           injured my neck and--
           ALJ: ... I guess my question is more why didn't you file in
           2000 or 2001 or 2002 or 2003?
           Ms. Couch: I was waiting to hear back.
```

Tr. 622-23.

On April 9, 2005, ALJ Tielens issued a second decision unfavorable to Ms. Couch. The Appeals Council denied Ms. Couch's request for review on August 21, 2005, making the ALJ's decision the final decision of the Commissioner.

## Factual Background

Born March 2, 1955, Ms. Couch was 50 years old in April 2005, the time of the ALJ's second decision. She was 42 years old on the date of the ALJ's first decision. She completed ninth grade. Her past relevant work is as a housekeeper, care provider, child care provider, telephone solicitor, and motel cleaner. Her earnings for the years 1999, 2001, 2002 and 2003 fell below the levels required for substantial gainful work activity, tr. 442, but Ms. Couch engaged in substantial gainful activity in the years 2000 (earnings $8,523) and 2003 (earnings $10,884), caring for her grandchildren and a daughter who is disabled by spina bifida.

## Medical Evidence

The medical evidence in the administrative record comprises the years between 1988 and 1997, then resumes for the period April 2003 to June 2004.

On September 18, 1988, Ms. Couch lacerated her right forearm flexor tendons, median nerve, and ulnar nerve. Tr. 289-90. As a result, she lost tendon function in the right index finger. Tr. 290. However, an examination on March 6, 1995 by John Stevens, M.D., the orthopedist who had treated Ms. Couch for the right forearm injury, revealed that Ms. Couch had excellent post-operative recoveries from residual ulnar hypesthesia, with a well muscled forearm and upper arm with full range of motion; negative Tinel sign over the ulnar nerve; full range of motion of the digits; and "reasonably decent motor function" of the ulnar nerve in the hand and intact medial nerve function. The only abnormality was some hypesthesia down the ulnar distribution of the right hand. Tr. 373.

During an evaluation by the Oregon Vocational Rehabilitation Division on December 31, 1991, Ms. Couch reported that she had frequent low back pain which occasionally interfered with her sleep. Tr. 338. Ms. Couch stated that sometimes it took as long as 40 minutes for the pain to subside. Id. Occasionally, she had some radicular-type burning pain to her right leg. Id. She said she was able to tolerate sitting well, but standing was tolerated for only about ½ hour. Tr. 339. She said she was able to walk for an hour. Id.

On April 2, 1992, Ms. Couch presented at the emergency room with complaints of neck pain. Tr. 311. The diagnosis was cervical

strain, caused by an assault approximately two weeks earlier. Id.; tr. 313. X-rays taken on that date were normal. Tr. 313.

On July 5, 1992, Ms. Couch was seen by Thomas Shinder, M.D., for an agency evaluation. Tr. 314. Her main complaint was back pain. Id. Ms. Couch said she had experienced back pain all her life, and said it included occasional numbness and tingling in her feet. Id. The pain was increased by walking, sitting, or remaining in the same position. Id. Ms. Couch said she had been told she had spondylitis. Id. Examination was essentially normal. Id. Dr. Shinder found no evidence of active arthritis. Tr. 315. Dr. Shinder's diagnosis was musculoskeletal pain syndrome with no functional limitations. Id. He recommended analgesic therapy. Id.

On July 25, 1992, Ms. Couch was seen for a psychiatric evaluation by Jeffrey Meyerhoff, M.D. Tr. 316. Ms. Couch reported "tremendous difficulty with mood swings." Id. She was currently in an episode of depression, but without suicidal ideation. Id. Ms. Couch said she was being treated with Prozac, but that it was not helping. Tr. 317. Ms. Couch reported having been sexually abused by her father between the ages of 9 and 15. Tr. 317.

Dr. Meyerhoff thought Ms. Couch might have cyclothymic disorder, "given her persistence of her mood fluctuations," but did not think she had a major depressive disorder, a manic depressive disorder, or a psychotic disorder. Tr. 318. He thought her ability to relate and interact with supervisors, co-workers

and the public were sufficient, but that the "cycling of her mood could at times interfere." Id. Dr. Meyerhoff thought Ms. Couch's ability to understand, remember and carry out simple one or two step job instructions appeared to be adequate, although she reported that at times her concentration was poor. Id. Dr. Meyerhoff thought her ability to "withstand the stress and pressures associated with day-to-day work activity would appear to be difficult." Id. Prognosis was guarded, because Ms. Couch had reported that various medications, including Prozac, Valium, and Imipramine had been unsuccessful. Id.

On March 6, 1995, Dr. Stevens noted that Ms. Couch was complaining of pain in the right hip and right lower leg. Tr. 373. Examination showed mild limitation in neck motion with pain around the neck on movement. Id. Ms. Couch's gait was normal, and she stood on one leg without difficulty. Id. Motor testing at the foot level was intact; leg length was equal; range of motion of the hips and knees was full and without palpable atrophy. Id. Dr. Stevens found her to be a "well muscled individual," and her pulses were intact. There was some tenderness over the right sacroiliac joint. Id. X-rays were normal. Id.

In April and May 1995, Ms. Couch was treated by Peter Bernardo, M.D., for a benign lipoma on the lateral aspect of her right leg. Tr. 374-75. In Dr. Bernardo's opinion, the lipoma was not the cause of her complaints of pain in the lower back, hip

and right leg. Id.

In May 1995, Ms. Couch was seen by Jeffrey Ward, M.D., for complaints of urinary incontinence. Tr. 379. Dr. Ward diagnosed the presence of chronic detrusor[1] instability with urgency incontinence. Tr. 379. Symptoms were markedly enhanced by Ms. Couch's consumption of more than six cups of coffee a day. Id. When Ms. Couch was placed on decaffeinated beverages, she was significantly improved. Id.

In June 1995, Ms. Couch was admitted to the Emergency Department of Salem Hospital complaining of right flank and right lower quadrant pain, as well as some neck pain. Tr. 390. She was seen by Michael Hare, M.D., who started an IV with Demerol and Phenergan, which gave her relief from the pain. Tr. 391. Dr. Hare thought gallbladder disease should be ruled out, and noted that Ms. Couch had "no problem with her neck at this time other than the muscles feel a little bit stiff." Id. An abdominal ultrasound done on June 27, 1995 was negative. Tr. 393.

On June 12, 1995, Ms. Couch was seen for a request to change her medication for depression. Tr. 398. She was currently on Prozac, which she had been taking for about a year, and it had caused her to gain weight. Id. The Prozac was discontinued and she was started on Zoloft. Id.

---

[1] A muscle that has the action of expelling a substance. *Stedman's Medical Dictionary* 524 (28th ed. 2006).

On December 2, 1995, Ms. Couch was given a psychiatric evaluation by Solomon Wolf, M.D. Tr. 404-408. Her chief complaint was that she was unable to concentrate and was forgetting things. Tr. 404. Her current medications were Zoloft and Zantac. Tr. 405. She gave a history of drinking from the age of 13, on a daily basis except for periods when she was pregnant. Tr. 404. Ms. Couch stated that the last time she drank was in 1994, but then acknowledged that she drank two glasses of wine at Thanksgiving. Id.

Ms. Couch told Dr. Wolf that she had had difficulty concentrating and remembering for as long as she could remember. Tr. 406. However, she reported being independent in her own hygiene and overall care, living in a house belonging to her mother. Tr. 406. Ms. Couch reported that she shopped about four times a month, cooked every day, and cleaned house every day, although she had low endurance and frequently became fatigued. Tr. 406.

Dr. Wolf did not administer psychological testing. At the interview he noted that Ms. Couch's thought processes appeared to be sequential, her attention and concentration grossly intact, and her short term memory mildly impaired. Tr. 407. His diagnoses were all provisional: alcohol dependence, possibly in remission; rule out alcoholic depression; rule out adjustment disorder with depressed mood; rule out major depression; rule out dysthymia;

rule out alcohol-related memory problems; and rule out personality disorder. Id. Dr. Wolf opined that it was "quite difficult" to sort out the etiology of Ms. Couch's mood disorder, which "could be a combination of organic-affective changes due to alcohol abuse, and an underlying dysthymic disorder, as well as psychological reaction to life's stresses in a claimant with a personality disorder." Tr. 408. Dr. Wolf was concerned about Ms. Couch's claims of forgetfulness, because amnestic disturbances are "frequent manifestations of severe alcohol abuse." Id. However, Dr. Wolf thought a neuropsychological evaluation would be necessary to determine the nature and extent of memory problems. Id.

Dr. Wolf opined that currently, Ms. Couch would be unable to deal with the public; unable to relate to and interact with potential supervisors and co-workers; and unable to withstand the stresses and pressures associated with an eight hour work day and day to day work activities. Id. He did not think she should manage her own funds without assurance of her following through with a specialized alcohol treatment program. Id.

Ms. Couch was examined by Leon Feldman, M.D. on January 13, 1996. Tr. 409. Her complaints were numbness in the third, fourth and fifth fingers of the right hand, lumbosacral back pain, and neck pain. Ms. Couch said the back pain prevented her from working because exertion exacerbated the pain. She described

being unable to stand for more than two to three minutes and being unable to sit for more than 30 minutes at a time. Id. She characterized her neck pain as progressive over the past two to three months. Id.

Upon examination, Dr. Feldman found that Ms. Couch's spine appeared normal and without paraspinal vertebral spasm. Tr. 412. There was mild tenderness at approximately S1 bilaterally to palpation, but no crepitus or effusion or trigger points. Id. She had normal muscle bulk, tone, and strength in the upper and lower extremities, including hand grip. Id. Sensory examination was normal except for the third, fourth and fifth fingers of the right hand, which had some decreased pinprick and light touch sensation. Tr. 413.

Dr. Feldman concluded that the physical examination demonstrated trauma to the tendons passing through the right wrist, and that Ms. Couch's described symptoms of numbness in the right hand were consistent with median nerve entrapment. Tr. 413. Dr. Feldman noted that there was no evidence for abnormality in hand grip or fine motor coordination, although he was unable to "comment on the endurance of the wrist." Id.

With respect to the back symptoms, Dr. Feldman diagnosed mild chronic lumbosacral pain syndrome without neurologic involvement. Id. Dr. Feldman attributed the neck pain complaints to "a tension type muscular strain." Tr. 414. Dr. Feldman noted,

"Other than mild to perhaps moderate discomfort with palpation and neck flexion, the examination does not point to any discrete abnormality." Id.

The medical records for 2003 and 2004 show that Ms. Couch was treated for migraines with Imitrex, tr. 554, 556 for recurrent epigastric pain with ranitidine (Zantac)[2] tr. 554, 558, 560, 562, and with albuterol for asthma symptoms exacerbated by allergies. Tr. 560. On March 6, 2003, she complained of back and neck pain, of one day's duration, which she attributed to strain from moving her daughter's electric wheelchair. Tr. 572. Upon examination, range of motion was essentially full with some diminished full extension of the neck. Id. On palpation the neck showed tenderness along the paraspinous muscles, extending into the area between the scapulae. Id. She was diagnosed with recurrent cervical strain and prescribed Tylenol #3 and Flexeril. Id.

On March 21, 2003, Ms. Couch returned for continued problems with neck and shoulder pain. Tr. 570. She stated that the Flexeril made her groggy, and that she had also quit taking the Prozac. Tr. 570. She was given more Tylenol #3 and Lexapro for depressed mood. Tr. 570. On April 2, 2003, she was seen for followup on neck and left arm pain. Tr. 568. She reported that

_____

[2] An upper GI series done on June 26, 2003, was normal except for minimal spontaneous gastroesophageal reflux. Tr. 585.

the Tylenol #3 and other medications had not been helpful. Id. Her left upper trapezius was injected with lidocaine, which gave immediate improvement in the pain. Id.

X-rays taken in April 2003 showed mild to moderate degenerative disc disease and bilateral foraminal stenosis at C5-6 and C6-7, and minimal degenerative disc disease at C4-5. Tr. 588.

In May 2003, it was noted that Ms. Couch complained of intermittent, but persistent, numbness of her left arm. Tr. 562. On July 23, 2003, it was noted that Ms. Couch reported that the numbness had resolved spontaneously. Tr. 558.

A physical residual functional capacity assessment done in June 2004 by agency consulting physician Mary Ann Westfall, M.D., and based on diagnoses of degenerative disc disease of the cervical and lumbar spine and migraines, indicates that Ms. Couch has the ability to lift up to 50 pounds occasionally, and up to 25 pounds frequently; the ability to stand and/or walk about six hours in an eight hour work day, and sit about six hours in an eight hour work day. Tr. 594.

An evaluating psychologist, Paul Rethinger, Ph.D., completed a psychiatric records review form finding the existence of an affective disorder, depression, that imposed mild difficulties in maintaining concentration, persistence or pace, but no other limitations. Tr. 603-616.

**Hearing Testimony**

Asked about her history of alcohol abuse, Ms. Couch testified that she was a "very, very limited drinker," who last drank the month previously at a birthday party and had four glasses of wine. Tr. 624. She denied drinking on a daily basis, id., and testified that her period of heavy drinking had been in the 1980s. Tr. 625. She said she was currently able to drink one day and not drink again for months. Id.

Ms. Couch testified that she had never been fired from a job. Tr. 626. At the time of the hearing, she was working one day a week for Senior Disabled Services, doing housecleaning for a blind man. Tr. 627. In 2003, Adult and Family Services paid Ms. Couch to care for her grandchildren while her daughter worked. Tr. 627. She cared for a one-year-old child every day, and for two school-age children after school. Tr. 627-28. The job ended after about seven months because Ms. Couch's daughter had to leave her job. Tr. 628. Ms. Couch said she also worked for Senior Disabled Services in 2000, 2001 and 2002, doing housekeeping and personal care. Tr. 629. She also gets paid, on a part-time basis, for caring for her adult disabled daughter. Id.

When asked about the gap in the medical records between 1997 and 2003, Ms. Couch testified that she did not have health insurance during some of that time, and that she had problems with the Oregon Health Plan, so that she would see emergency room

15  - OPINION AND ORDER

physicians, but did not have a primary care physician. Tr. 633.

Ms. Couch testified that she has ongoing headaches, as well as migraines at least twice a month. Tr. 634-35. The migraines last from 12 to 15 hours, and she is unable to function during that time. Tr. 635. Ms. Couch said she also has neck pain which started "three years ago, four years ago," tr. 635, such that by the end of the day, her neck was "real weak." Tr. 636. She occasionally wears a neck brace and takes hydrocodone and codeine. Tr. 636. She also takes muscle relaxants, <u>id.</u>, and does physical therapy twice a week. Tr. 640. Ms. Couch said that reaching over her head bothers her, as does turning certain ways. <u>Id.</u>

Ms. Couch said her left arm had been painful on a daily basis for the last two years. Tr. 636. She said the pain in her left arm had started when she hurt her neck, and that lifting and moving certain ways exacerbated it. Tr. 637.

Ms. Couch testified that she also has weakness and pain in her lower back, of many years' duration. <u>Id.</u> She said the pain shoots down her legs, and has become worse over the last three or four years. Tr. 638. She said she is unable to sit or stand for more than half an hour before having to change positions. Tr. 638. She testified as well to pain and numbness in her legs and feet when walking more than a mile. Tr. 639.

Ms. Couch testified that she was currently taking Welbutrin

for depression, which caused her to become dizzy and also gave her some stomach trouble. Tr. 639. She said she has panic attacks, which caused her to stop driving. Tr. 640.

Ms. Couch testified that she is currently taking albuterol for asthma, Maxalt for migraines, and codeine and Flexeril as needed for pain and muscle relaxation. Tr. 643. When asked what she does for her adult disabled daughter, Ms. Couch stated that she helps her in and out of the shower, cooks for her, intermittently sets her up to catheterize herself, gives her medicine, sets up her doctor appointments, and does her laundry. Tr. 645. Ms. Couch testified that her son became schizophrenic in his early 20s, and is currently living with her. Tr. 646. Ms. Couch does not get assistance for him, but she helps manage his medications. Tr. 646. Ms. Couch acknowledged that, despite her asthma, she still smokes, about a pack a day. Id.

The ALJ called a vocational expert (VE), Nancy Bloom. The ALJ asked her to consider a hypothetical individual, with Ms. Couch's age, educational background and work experience, who was able to lift and carry between 20 and 50 pounds occasionally and 10 to 25 pounds frequently; able to stand or walk six of eight hours or sit six of eight hours, but needing to change positions every hour; only occasionally able to balance, use ramps or stairs, or reach overhead; and precluded from using ladders, ropes or scaffolds, from constant, forceful gripping, and from

17  - OPINION AND ORDER

hazards. The individual would also not be capable of skilled work because of difficulties in concentration at times with headaches, and with limited interaction with co-workers and the public. Tr. 651. The VE opined that such a person could work as a small parts assembler, electronics worker, and packing line worker. Tr. 651.

### ALJ's Decision

The ALJ noted that Ms. Couch has performed several jobs since the alleged date of her disability, including dietary aide for two months, considered an unsuccessful work attempt; house cleaner for an elderly person; daycare provider for her grandchildren for seven months, six or more hours per day, five days a week; and care giver for her adult daughter. Tr. 442. The ALJ found that although most of Ms. Couch's earnings fell below the level indicative of substantial gainful activity, she did engage in substantial gainful activity in 2000 and 2003.

The ALJ reviewed the medical evidence and concluded that Ms. Couch had the following severe impairments: 1) mild to moderate degenerative disc disease and bilateral foraminal stenosis at C5-6 and C6-7, 2) intermittent right hand weakness, and 3) migraine headaches. The ALJ rejected Ms. Couch's testimony of left hand problems, noting that the medical records indicated that Ms. Couch's complaints of weakness and numbness in the left arm had resolved spontaneously by July 2003. He found that Ms. Couch's alleged difficulties with urinary incontinence were not

severe because they significantly improved when she lowered her consumption of coffee.

The ALJ found that Ms. Couch's asthma was controlled with albuterol, and that she continued to smoke. He found no evidence of work-related functional limitations resulting from asthma, and therefore that asthma was not a severe impairment.

The ALJ found no evidence in the treatment record to support Dr. Wolf's conclusion that she abused alcohol. The ALJ noted Ms. Couch's testimony at the hearing that she did not drink very much, and found no evidence to the contrary. Accordingly, the ALJ found that Ms. Couch's history of alcohol abuse was not a severe impairment.

The ALJ noted that Ms. Couch had a history of depression, but found no evidence of difficulty with depression after she was prescribed Lexapro. The ALJ found that Ms. Couch's depression resulted in mild restriction of activities of daily living, because of the evidence that she functions independently and has performed extensive care giving services for others. The ALJ rejected Dr. Wolf's opinion that Ms. Couch would be unable to deal with the public and interact with supervisors and co-workers because of her history of performing elder care and child care without difficulty. The ALJ accepted the finding of Dr. Rethinger that Ms. Couch had mild difficulties in maintaining concentration, persistence or pace, and the finding of Dr. Wolf

19  - OPINION AND ORDER

that she exhibited mild short-term memory impairment, but that her attention and concentration were grossly intact.

The ALJ then considered whether, considering her severe impairments, Ms. Couch retained the residual functional capacity to perform either her past relevant work or other work existing in the national economy. The ALJ took particular note of the evidence that Ms. Couch was currently working one day a week doing housework, and that she had previously taken care of her grandchildren, a one year old every day, and two school age children after school. The ALJ noted that this job ended, not because of disability, but because Ms. Couch's daughter quit working. The ALJ also found that Ms. Couch had also done personal care and housekeeping work, for which she was certified by the state, and that she had been paid to care for her adult disabled daughter.

The ALJ found Ms. Couch's testimony of debilitating pain and fatigue not credible, in light of the evidence that Ms. Couch had performed significant work since her alleged onset date, such as providing daycare for her grandchildren approximately 30 hours a week for seven months; being the primary care giver for her adult daughter, including cooking, cleaning, shopping, handling medications, and helping her daughter to catheterize; and managing medications for her schizophrenic son. The ALJ noted Ms. Couch's statement to her doctor in April 2003 that she was the

caretaker for two adult disabled children, involved in all aspects of their care except lifting them. Tr. 568.

The ALJ found Ms. Couch's credibility further undermined by minimal medical treatment in the recent past. Ms. Couch explained that she lacked insurance until 2003, but the ALJ found that even after obtaining insurance, most of her treatment was for minor, temporary health problems such as sinusitis and bronchitis. The ALJ found that she was seen for complaints of neck and back pain in March and April 2003, but that treatment records after that date reveal no further complaints of back or neck pain.

As discussed above, the ALJ rejected Dr. Wolf's opinions about alcohol abuse, and inability to handle stress or to work with others. Similarly, the ALJ found Dr. Meyerhoff's opinion that Ms. Couch's moods could interfere with her ability to relate to and interact with supervisors, coworkers and the public to be inconsistent with her activities in performing elder care and child care without difficulty, noting that by Ms. Couch's testimony, she had never been fired from a job.

Based on the assessment of Dr. Westfall, the ALJ found that Ms. Couch had the residual functional capacity to perform some of the requirements of light work, including lifting 20-50 pounds occasionally and 10-25 pounds frequently; standing and walking six hours out of an eight hour day; and sitting six hours a day with the opportunity to change positions for a few minutes every

hour. She was precluded by the migraines from using ladders, ropes, and scaffolds, precluded from forceful gripping because of the nerve damage to her right hand, precluded by her mental limitations from skilled work, and unlimited interaction with the public and co-workers.

Based on the Medical-Vocational Guidelines, under which Ms. Couch was an individual closely approaching advanced age, with a limited education, able to do light work with some limitations, and based on the testimony of the VE, the ALJ concluded that Ms. Couch could perform the work of a small products assembler, electronics worker, and packing line worker.

### Standards

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the

Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. <u>Meanel</u>, 172 F.3d at 1113; <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, the Commissioner goes

23  - OPINION AND ORDER

to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant

work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

### Discussion

Ms. Couch asserts that the ALJ erred when he found her capable of substantial gainful activity, and when he found her hearing testimony not credible.

### 1.   Did the ALJ err in finding Ms. Couch capable of substantial gainful activity?

Ms. Couch asserts that the evidence demonstrates she is not able to return to gainful employment, because she has not been able to hold a job on a sustained basis. Ms. Couch relies on <u>Gatliff v. Commissioner</u>, 172 F.3d 690, 694 (9th Cir. 1999).

In <u>Gatliff</u>, the claimant was functionally illiterate and suffered from several severe mental impairments, including antisocial personality disorder, expressive language disorder, probable attention deficit, and hyperactivity disorder. During the 15 years prior to his claimed disability, Gatliff was employed sporadically and held 20-30 jobs. He was terminated from

at least half of those jobs-- the longest of which lasted six to eight months-- due to anger problems and conflicts with supervisors or co-workers. 172 F.3d at 691.

The ALJ found that Gatliff had the ability to perform light work, the range of which was reduced by his social and intellectual limitations. The ALJ's hypothetical to the VE assumed that Gatliff would require "simple and repetitive" tasks, and "little interaction with co-workers and supervisors." Id. However, the VE had testified that Gatliff could only be expected to stay in any one job for a "couple of months" before being fired as a result of his mental impairments. The VE also testified that Gatliff's pattern--the ability to obtain, but not maintain, jobs-- would continue. Id.

The district court affirmed the ALJ, but the Court of Appeals reversed, holding that, because the Commissioner had conceded that Gatliff was unlikely to be able to maintain any single job for more than about two months, the question was what period of employment satisfied the "substantial gainful activity" requirements of the Act. Id. at 692.

The court was persuaded by the reasoning of its sister circuits that substantial gainful activity "means more than merely the ability to find a job and physically perform it; it also requires the ability to hold the job for a significant period of time." Id. at 694. The court continued,

26  - OPINION AND ORDER

It requires no leap to conclude that two months is not a significant period. Indeed, the SSA considers jobs that end within three months because of the claimant's impairments to be "unsuccessful work attempts," and does not consider such short-term jobs as evidence of an ability to engage in substantial gainful activity [citations omitted]. If a job of less than three months does not constitute substantial gainful activity when considering the claimant's past work history, the same holds true with regard to prospective employment.

Where it is established that the claimant can hold a job for only a short period of time, the claimant is not capable of substantial gainful activity. ... Although we do not purport to define exactly how long a period of employment must last to be considered "significant," a job of two months' duration is certainly insufficient. The concept of substantial gainful activity requires more and consequently we hold that Gatliff was not capable of "substantial gainful activity."

Id.

The Commissioner has failed to address Ms. Couch's argument in her brief. However, I am not persuaded that Gatliff is applicable to the facts of this case. In Gatliff, the evidence was uncontradicted that the claimant had severe social disabilities, including antisocial personality disorder. That is not the state of the evidence in this case. The ALJ rejected Dr. Wolf's opinion that Ms. Couch was unable to deal with the public, relate to and interact with supervisors and co-workers, and withstand the stresses and pressures associated with full-time daily work activities. The ALJ rejected this opinion because it was premised in large part on Dr. Wolf's assumption that Ms. Couch was abusing alcohol, an assumption for which the ALJ found

no support in the record. Instead, the ALJ accepted the conclusion of Dr. Rethinger that Ms. Couch's depression imposed mild difficulties in maintaining concentration, persistence, or pace, but no other work-related limitations.

Further, in <u>Gatliff</u>, the Commissioner conceded that the claimant was incapable of sustained employment, and the evidence showed that Gatliff had been fired from at least half of his jobs. There has been no such concession from the Commissioner in this case, and Ms. Couch herself testified that she has never been fired from a job.

And finally, it is not demonstrated in this case that Ms. Couch's sporadic job history is attributable to physical or mental impairments. Ms. Couch's testimony at the hearing was that her sporadic work history was due to other factors.  When asked why she earned essentially no income in 1994, 1995, 1996, and 1997, after the onset date of her alleged disability, Ms. Couch responded that it "took me that long to get myself back together" after the death of her common-law husband in 1994, and that she had received some life insurance. Tr. 631-32. When asked why her various jobs had ended, she responded that she had "never been fired from a job," and that she might "have quit or I had to take leave due to--I have a daughter at home I care for," or "[i]t could have been a family problem," or a "medical problem with myself." Tr. 626.

Ms. Couch argues that her testimony, that she has at least two migraines a month and is bedridden for their duration, coupled with all of her other impairments, proves that she is unable to hold a job for an extended length of time. However, the ALJ found Ms. Couch not entirely credible on those matters, based on the evidence that her migraines are controlled with medication and on her current ability to run a household, care for her disabled daughter, and manage the medications for her disabled son, as well as her prior ability to care for three young grandchildren on a full-time basis for a period of seven months.

### 2.    Did the ALJ err in finding Ms. Couch not entirely credible?

Ms. Couch argues that the ALJ erred in his credibility assessment, arguing that she was not required to produce medical evidence to support the severity of her pain.

The ALJ is entitled to make a credibility assessment of claimant's testimony. Polny v. Bowen, 864 F.2d 661 (9th Cir. 1988). If a claimant proves the existence of an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). However, a claimant's testimony about pain and other symptoms such as fatigue and dizziness may be disregarded if it

is unsupported by medical evidence which supports the *existence* of such symptoms, even though the claimant need not submit medical evidence which supports the *degree* of symptoms alleged. Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991)(en banc).

In evaluating credibility of symptom testimony, the ALJ may, as he did in this case, consider such factors as the claimant's work record, the observations of treating and examining physicians, functional restrictions caused by symptoms, and the claimant's daily activities. Smolen v. Chater, 80 F.3d 1273 (9th Cir. 1996). With respect to daily activities, the Ninth Circuit has held that if a claimant is "able to spend a substantial part of her day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." Morgan v. Commissioner, 169 F.3d 595, 600 (9th Cir. 1999). Other factors the ALJ may consider are the ability to perform household chores, inconsistencies between the claimant's testimony and the medical evidence, including the claimant's statements to medical providers, and the absence of requested medical treatment for the alleged symptoms. Morgan, 169 F.3d at 599-600; Orteza v. Shalala, 50 F.3d 748 (9th Cir. 1995).

The chart notes from Ms. Couch's treating physicians indicate that Ms. Couch obtained relief from her migraines,

30  - OPINION AND ORDER

asthma and depression from medication. Dr. Feldman, in 1996, found no medical condition which would account for Ms. Couch's complaints of such excruciating back pain that she was unable to stand for more than two to three minutes: he diagnosed mild chronic lumbosacral pain syndrome without neurologic involvement. Nor could Dr. Feldman find any abnormality to account for Ms. Couch's back and neck pain.

As the ALJ noted, Ms. Couch requested no treatment for back and neck pain for the next seven years. In March 2003, Ms. Couch sought treatment for back and neck pain, but she reported that it was only of one day's duration, and that it had been caused by trying to move her daughter's wheelchair. At that time, the diagnosis was cervical strain. X-rays taken in April 2003 showed only mild to moderate degenerative disc disease of the cervical spine. Evaluating physician Mary Ann Westfall concluded, on the basis of these tests and diagnoses, that Ms. Couch was capable of lifting up to 50 pounds occasionally and 20 pounds frequently, stand and/or walk for about six hours of an eight hour day, and sit about six hours in an eight hour day.

Moreover, in assessing Ms. Couch's credibility, the ALJ considered Ms. Couch's own testimony that she was able to clean both her house and that of her blind Senior Disabled Services client. She also testified that she had done housekeeping and personal care for Senior Disabled Services in 2000, 2001 and

31  - OPINION AND ORDER

2002. The ALJ properly noted the inconsistency between this testimony and Ms. Couch's reported symptoms.

I find no error in the ALJ's credibility assessment.

### Conclusion

The ALJ's decision is based on substantial evidence in the record as a whole and is free of legal error. It is therefore affirmed.

IT IS SO ORDERED.

Dated this 20th day of September, 2006.

/s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge